## Kirk v. Kirk.

(Decided March 2, 1915.)

### Appeal from Fleming Circuit Court.

Contracts—Cancellation of.—Evidence examined and held sufficient to show that a land contract between the parties was cancelled a few days after it was made.

J. H. POWER, R. J. BABBITT and MARION BUCKLER for appellant.

JOHN P. McCARTNEY and B. S. GRANNIS for appellee.

OPINION OF THE COURT BY JUDGE CARROLL.—Affirming.

This law suit between Elmer Kirk, the appellant, a man more than sixty years old, and his sister, the appellee, C. P. Kirk, a maiden lady about sixty years of age, grows out of a difference between them concerning the rescission of a sale of a small but valuable tract of land.

The evidence shows that C. P. Kirk and her brother, Pope Kirk, an old bachelor, lived to themselves for a number of years in a plain, simple way, having no servants or family about them. They owned 34 acres of

land adjoining the farm of Elmer Kirk, on which they lived. Pope Kirk died on Friday, September 27, 1912, and upon his death his sister, the appellee, by some arrangement between them, became the owner of the little farm on which they lived.

A few days after the death of her brother C. P. Kirk sold the 34 acres to Elmer Kirk for $3,750, and at the same time sold him some corn for $50, making the total transaction $3,800. He gave her his check for $300 and his note for the balance of the purchase money, and she gave to him a writing evidencing the sale. A few days after this the check, contract and note were destroyed in the manner described later, and thereupon C. P. Kirk, believing that the trade between her brother and herself had been cancelled, offered the land at a public sale, on October 10, 1912, at which sale it was bought by Elmer Kirk for $5,072.80. He paid on the purchase price $2,500, but declined to comply with the terms of this public sale as to the remainder of the purchase price upon the ground that the first contract of sale between them had never been cancelled, and being the owner of the land by virtue of that contract, he owed only $1,300, the difference between the $2,500 and $3,800, the amount of the first contract. Upon his failure to perform the terms of the public sale, C. P. Kirk brought this suit against him.

For defense Elmer Kirk relied on the validity of the first contract and set up a number of defenses to the suit.

After the case had been submitted on the pleadings and evidence, the court adjudged that Elmer Kirk must comply with the terms of the public sale, and entered judgment accordingly.

In the view we have of this case it seems necessary to determine only whether the first contract was cancelled. If it was, the judgment compelling him to perform the terms of the contract under which he bought the land at the public sale should be affirmed.

There is some room for criticism as to the fairness and validity of the contract entered into between these parties on October 1, 1912, but, assuming that it was a valid contract, we think the evidence shows that the parties cancelled the contract a few days afterwards, or about October 4, 1912, and, if they did cancel it, of course Elmer Kirk has no rights that he can assert under the contract. Whether this contract was cancelled or not

is purely a question of fact, and, in disposing of the case, we will confine the opinion to the facts concerning the cancellation of the contract.

C. P. Kirk testifies, in substance, that on the Monday following her brother's death she asked her brother, Elmer Kirk, if he wanted to buy the farm, and told him if he did he could have first choice, but that he said the place had been badly abused and was not worth what she asked for it, and no trade was made on that day; but on the following day, Tuesday, he came back to write the sale bills for her, as she desired to sell some personal property she had, as well as the farm, at a public sale. That during this visit he prevailed on her to let him have the farm at $3,750 and some corn for $50. She says: "He set the price and I wanted more, and he held me there until he bought it. I was nervous and he held me there until he bought it. I mean he just kept me there and argued until he bought the farm. I told him to advertise on the sale bill, but he never wrote it out. I says, 'I can put it up and sell it, and if it don't bring what I want it to bring, I can take it down.' He says, 'Nobody will bid on it. I wouldn't bid against a fool, and if Joe Blair and Shella buy it, you will be responsible for their money if they lose it.' I tried to get more, but he would not give it. I was nervous and worked up and just sold it right there." That she signed the contract without reading it and he took it home with him. It also appears that he left with her a check for $300 and a note for the balance of the purchase money.

C. P. Kirk further testifies that the next day, or the day after, she became dissatisfied with the trade and met Elmer Kirk on the road and told him she was dissatisfied with the trade, and he says, "I am going to bring you your papers," and that he did get the contract and return it to her, and she understood that his act in returning the contract cancelled the trade and she threw the note in the fire and gave the check to her sister, who delivered it to Elmer Kirk, or disposed of it as will better appear in her testimony.

Mrs. Paulina Shockey, a sister of the parties, testified that a day or so after the contract was written she went to see Elmer and told him that her sister was dissatisfied and she wanted to know if he would not let her have it back. That she was nervous and could not sleep.

That during that day she heard her sister ask him to let her have the place back and he said, ''I am going after the contract,'' and he came and brought the contract and handed it to me without saying anything; but she said to him, ''I don't know whether I know where all the papers are, but I know where part of them are, but I will let them be and let Pickett (their sister) give them to you.'' ''I was talking about the $3,500 note and the check, and told him that I would let my sister give them to him.''

She further testified that her sister destroyed the $3,500 note and that she took the contract and the check back to Elmer Kirk at her sister's direction, as they both thought the trade had been cancelled and her sister wanted to return the papers after she told her not to burn them, although she had burned the note. That when she took the check and contract to Elmer Kirk's house he was not at home. That she offered the papers to one of his daughters, but she refused to take them, and thereupon she put them in the fire.

James Blair, a neighbor of the parties, said that he had a conversation with Elmer Kirk between October first and the date of the public sale, in the course of which ''Elmer just made the remark that Pickett was dissatisfied with the trade, and he just says, 'I just turned the papers over to her and told her to take them and do what she pleased with them. That I would have no more to do with it.' That was before the public sale.''

Elmer Kirk, in his testimony, in relating the circumstances of the first contract, said that his sister told him that her price was $4,000 and that she could get that much, but that she finally agreed to accept $3,800. That he delivered her the check for $300 and the note and took the contract that she had signed home. He further said that a few days afterwards, when she wanted to cancel the contract, she said that he had swindled and defrauded her and had her to sign an agreement without reading it to her or permitting her to read it; and for the purpose of showing her that he had not swindled her he went home and got the contract and gave it to her so that she might read it, but not intending thereby to abandon the trade. That when he bought the land from her ''she was there to represent her own interest.

I extended her the courtesy of believing her to be quali-
fied to do so. I was there to represent my own interest,
and it is characteristic of me also to make the best deals
I can," and that he merely bought the land at the public
sale in order to protect his rights. That he knew that
he owned the land by virtue of the first contract, and
in order to avoid any complications with any person
else who might buy it at the public sale, he bought it
himself, with the intention of protecting his first con-
tract and for no other purpose. He also denied the con-
versation with Blair, but, in answer to the question, "I
will ask you to answer my question and say whether or
not what Jim Blair said occurred did occur?" he said:
"Not the way he said it did. I told him I did not know
whether I would have anything to do with it or not, but
I did not say positively I would not. I didn't tell him
that she could do what she pleased with it."

It seems quite evident that the chancellor came to
the conclusion that the evidence we have related was
sufficient to show the cancellation of this trade, and we
concur in his conclusion.

Although Elmer Kirk insists in his evidence that the
contract was not cancelled, there are several reasons why
he should have cancelled it, and the circumstances show
that, under the influence of these reasons, he did so. At
the time he made the trade with his sister she was in a
lonely state of mind and not in a condition to deal on
equal terms with a shrewd, smart business man like her
brother. The land was worth much more than he agreed
to pay her for it, as is shown by the fact that at the pub-
lic sale about ten days afterwards it brought, after
competitive bidding, $1,322 more than he was to pay.
Under the circumstances we are inclined to think that
Mr. Kirk must have known that he secured the land from
his sister at less than it was worth and at a time when
she was not fully capable of protecting her rights, and
that knowledge of this fact operating upon his con-
science persuaded him to assent to her proposition that
the trade be cancelled. The delivery to her of the con-
tract, and the destruction afterwards of the note, check
and contract, furnish quite convincing evidence that all
the parties treated the contract as set aside. And this
view is somewhat aided by the fact that he bought the
land at the public sale. It is not likely that a good busi-
iness man, such as the evidence shows him to be, would

have bought this land at the public sale if he had felt entirely secure of the validity of the prior contract for its purchase. The evidence, too, shows that the land is reasonably worth the price he paid for it at the public sale; and this being so, the judgment of the lower court does not require him to do anything more than was just and right.

We think the judgment should be affirmed, and it is so ordered.